B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Ronald E. Stadtmueller, Chapter 7 Trustee | DEFENDANTS<br>BRIAN D. HECTOR, an individual; and MORGAN, LEWIS & BOCKIUS, LLP, a Pennsylvania limited liability general partnership |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>SULLIVAN HILL REZ & ENGEL, A PLC<br>James P. Hill, SBN 90478 / Gary B. Rudolph, SBN 101921<br>600 B Street, Suite 1700<br>San Diego, CA 92101 (Phone No. (619) 233-4100) | **ATTORNEYS** (If Known) |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☑ Trustee | ☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Complaint For Professional Negligence – Breach Of Duty Of Care, Breach Of Fiduciary Duty And Of Loyalty – And Practicing Law In California While Unlicensed; 28 U.S.C. §§ 157 and 1334; General Order 312-E of the U.S. District Court for the Southern District of California; 11 U.S.C. Sections 541 and 542; Rules 7001(1) and 7008 of the Federal Rules of Bankruptcy Procedure; and Local Bankruptcy Rule 7008-1.

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11 - Recovery of money/property - § 542 turnover of property
☐ 12 - Recovery of money/property - § 547 preference
☐ 13 - Recovery of money/property - § 548 fraudulent transfer
☑ 14 - Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21 - Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31 - Approval of sale of property of estate and of co-owner - § 363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41 - Objection / revocation of discharge - § 727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51 - Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66 - Dischargeability - § 523(a)(1),(14),(14A) priority tax claims
☐ 62 - Dischargeability - § 523(a)(2), false pretenses, false representation, actual fraud
☐ 67 - Dischargeability - § 523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61 - Dischargeability - § 523(a)(5), domestic support
☐ 68 - Dischargeability - § 523(a)(6), willful and malicious injury
☐ 63 - Dischargeability - § 523(a)(8), student loan
☐ 64 - Dischargeability - § 523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65 - Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71 - Injunctive relief - reinstatement of stay
☐ 72 - Injunctive relief - other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81 - Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91 - Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01 - Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§ 78aaa *et.seq.*
☐ 02 - Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ Subject to proof at time of trial |

Other Relief Sought

B1040

B1040 (Page 2) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>IntegratedMarketing.com, dba Roni Hicks & Associates | | BANKRUPTCY CASE NO.<br>19-04688-CL7 |
| DISTRICT IN WHICH CASE IS PENDING<br>Southern District of California | DIVISIONAL OFFICE<br>San Diego | NAME OF JUDGE<br>Hon. Christopher B. Latham |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | |
|---|---|
| /s/ Gary B. Rudolph | |
| DATE<br>November 29, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Gary B. Rudolph |

# INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and the defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and in the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

B1040

SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
 James P. Hill, SBN 90478
 Gary B. Rudolph, SBN 101921
 Kathleen A. Cashman-Kramer, SBN 128861
600 B Street, Suite 1700
San Diego, California 92101
Telephone:  (619) 233-4100
Fax Number: (619) 231-4372

Attorneys for Plaintiff, Ronald E. Stadtmueller, Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re | CASE NO. 19-04688-CL7 |
| INTEGRATEDMARKETING.COM, dba RONI HICKS & ASSOCIATES, | Chapter 7 |
| | Adv. Pro. No. |
| Debtor. | **COMPLAINT FOR PROFESSIONAL NEGLIGENCE – BREACH OF DUTY OF CARE, BREACH OF FIDUCIARY DUTY AND OF LOYALTY – AND PRACTICING LAW IN CALIFORNIA WHILE UNLICENSED** |
| RONALD E. STADTMUELLER, Chapter 7 Trustee, | |
| Plaintiff, | |
| v. | |
| BRIAN D. HECTOR, an individual; and MORGAN, LEWIS & BOCKIUS, LLP, A Pennsylvania limited liability general partnership, | Dept.:5 Hon. Christopher B. Latham |
| Defendants. | |

Comes now Plaintiff Ronald E. Stadtmueller ("Plaintiff" or "Trustee"), the Chapter 7 Trustee of the bankruptcy estate ("Estate") of IntegratedMarketing.com dba Roni Hicks & Associates ("Debtor"), and alleges as follows:

/ / /

# I.

## **PARTIES**

1.    On August 2, 2019 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code")[1] in the U.S. Bankruptcy Court for the Southern District of California ("Court"), initiating the Chapter 11 case entitled In re IntegratedMarketing.com dba Roni Hicks & Associates, Case No. 19-04688-LA7 ("Bankruptcy Case"). Thereafter, on November 4, 2019 the case was converted to Chapter 7, and Ronald E. Stadtmueller was appointed Chapter 7 Trustee of the Estate.

2.    Plaintiff is informed and believes and thereon alleges that defendant Morgan Lewis  & Bockius ("Morgan Lewis") is a Pennsylvania limited liability general partnership, formed under, and operating under, the laws of the Commonwealth of Pennsylvania.

3.    Plaintiff is further informed and believes and thereon alleges that Defendant Brian Hector is an attorney licensed to practice law in the state of Illinois, and is a partner/shareholder in Morgan Lewis.  Defendant maintains an office for the purpose of practicing law in Chicago, Illinois.  Plaintiff is further informed and believes and thereon alleges that Defendant Brian Hector is not now, nor has he ever been, admitted to practice law in the state of California.

4.    For purposes of this Complaint, Morgan Lewis and Brian Hector are hereinafter collectively referred to as "Defendants Morgan Lewis."

## **JURISDICTION**

5.    This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 157 and 1334, as well as General Order 312-E of the U.S. District Court for the Southern District of California. This action is

---

[1] Unless otherwise indicated, all "Chapter" and "Section" references are to the Bankruptcy Code and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 – 9037.

commenced pursuant to 11 U.S.C. Sections 541 and 542, and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure ("FRBP").

6.     This Court may hear and determine this proceeding and enter appropriate orders and judgments pursuant to 28 U.S.C. § 157(b)(1) and (2).  This proceeding relates to the underlying Bankruptcy Case and is a core proceeding as set forth in 28 U.S.C. §§ 157(b)(1) and (2)(A), (E), and (O), in that it seeks to obtain turnover of property of the estate that was paid to the Defendant as well asserting a claim for damages based upon Defendants Morgan Lewis's professional negligence, which claims affect the administration of the Estate.

7.     Pursuant to FRBP Rule 7008, Plaintiff hereby consents to the entry of final orders or judgment by the Court.  Additionally, pursuant to Local Bankruptcy Rule 7008-1, if the Court determines this proceeding is a core proceeding, Plaintiff hereby consents to the entry of final orders or judgment by the Court.

## **STATEMENT OF FACTS**

8.     By way of background, Plaintiff is informed and believes and thereon alleges that the Debtor was founded in 1979 by Roni Hicks Clemens as a public relations and advertising agency serving a wide range of industries including real estate.  In 1999, the Debtor was sold to Jane Carey Wheeler ("Ms. Wheeler") and Diane L. Gaynor McCue ("Ms. McCue") who then incorporated the Debtor as Integratedmarketing.com dba Roni Hicks & Associates.

9.     Plaintiff is informed and believes and thereon alleges that Debtor specialized in real estate community planning, marketing, and public affairs.

10.     Plaintiff is informed and believes and thereon alleges that the Debtor, at the time of the actions and events described herein, was a California corporation, duly organized and existing under the laws of the state of California.

11.     Plaintiff is informed and believes and thereon alleges that on or about January 1, 2013 the Debtor established that the Roni Hicks & Associates Employee Stock Ownership Plan, dated January 1, 2013, as amended by that First Amendment

and Restatement dated as of January 1, 2017 ("ESOP Plan") and the Roni Hicks & Associates Employee Stock Ownership Trust dated January 1, 2013 ("ESOP Trust") (collectively "ESOP").  Plaintiff is further informed and believes and thereon alleges that the purpose of the ESOP was that all employees of the Debtor, should they choose, would participate in the ownership of the Debtor by virtue of their participation in the Plan and Trust, based upon certain formulas and conditions

12.    Pre-petition, and up until about May 15, 2019, TI Trust, Inc., formerly known as First Bankers Trust, Inc. ("TI") was the ESOP Trustee for the ESOP Trust. Effective May 15, 2019, TI was replaced as trustee with Miguel Paredes and Prudent Fiduciary Services, Inc. (collectively "Paredes").  Thereafter, on or about November 11, 2020, Paredes resigned as the ESOP Trustee for the ESOP Trust.

**A.    The March 2014 First Stock Sale Transaction.**

13.    The Trustee is informed and believes and thereon alleges that, when Ms. Wheeler, her husband Stephen Wheeler (collectively the "Wheelers"), Ms. McCue, and her husband Steven McCue (collectively the "McCues") (the Wheelers and the McCues are hereinafter collectively referred to as the "Sellers"), decided to retire, they structured a two-stage sale of their shares in the Debtor Company to their employees, many of whom had been with the company for more than 10 years, and the first stage of this process occurred in 2014.

14.    Specifically, Plaintiff is informed and believes and thereon alleges that in March 2014 the Sellers owned all of the issued and outstanding shares of the common stock of the Debtor.  The first stage of the ESOP Transaction was set forth in the Stock Purchase Agreement dated March 13, 2014 ("First SPA") pursuant to which the Sellers sold 49,000 shares of the common stock to the ESOP Trust for the purchase price of $5,350,000.00 which is approximately $109.18 per share.  The Wheelers sold 36,750 shares for a purchase price of $4,012,500 and the McCues sold 12,250 shares for a purchase price of $1,337,500.  These shares of stock collectively represented a 49% interest in the Debtor.

15.    Plaintiff is informed and believes and thereon alleges that Prairie Capital Advisors, Inc. ("Prairie") provided the valuation services, and issued the fairness opinion letter, which was relied on and utilized in establishing the value the stock in the First SPA.  Prairie opined that a fair price for the Debtor's stock, at the time of the First SPA in 2014, was $109.18 per share.

16.    Pursuant to the Loan and Security Agreement dated March 13, 2014 ("First Acquisition Loan") First American Bank ("First American Bank") provided financing in the amount of $5,350,000 for the purchase of the Seller's shares of the common stock of the Company. As noted above, at the time of the First Acquisition Loan, the Debtor Company's Board of Directors was comprised entirely of the Sellers and their family members. All of the Bank's loan documents for the First Acquisition loan which provided financing for the 2014 purchase of the stock from the Sellers were executed by Ms. Wheeler as President and/or as the Chief Financial Officer of the Company.  The First Acquisition Loan that the Debtor obtained to pay for these initial shares was all due and payable on March 1, 2019.  In addition, it provided that the Debtor/Company was required "to enter into employment contracts with Jane C. Wheeler and Diane Lori Gaynor-McCue, the terms of which shall in no event be less than the Term Loan Term;" e.g., to March 2910.  See section 9.18 [which also stated that the Debtor Company was to "provide Bank with the opportunity to review and disallow any other key management employment contracts prior to entering into any such contract." This provision ensured that the Sellers remained in control of the Debtor Company for the Second Stage of the ESOP Transaction.

17.    Plaintiff is informed and believes and thereon alleges that, between the time of the 2014 transaction and the 2017 transaction, the Sellers continued to control the Debtor's board of directors.  This includes, but is not limited to, making all decisions regarding payment of loans owed by the Debtor, the decision to incur new loans on behalf of the Debtor, and the decision to complete the sale of the Wheeler and McCue shares in 2017 (discussed below).

**B.    The June 30, 2017 Second Stock Sale Transaction.**

18.    Plaintiff is informed and believes and thereon alleges that, between the time of the 2014 transaction and the June 30, 2017, transaction ("Second SPA"), the Sellers continued to control the Debtor's board of directors.    Plaintiff is further informed and believes that Sellers' control included, but is not limited to, making decisions regarding payment of loans owed by the Debtor, deciding whether or not to incur new loans on behalf of the Debtor, and deciding to complete the sale of the Wheeler and McCue shares in 2017.  At this time, the Sellers collectively still owned 51% of the stock in the Debtor.

19.    On or about June 30, 2017, the Debtor entered into that certain Stock Purchase Agreement between itself, as the Company, First Bankers Trust Services, Inc. ("First Bankers"), as trustee of the Roni Hicks & Associates Employee Stock Ownership Trust (the "Trust"), and the Sellers (the "Second SPA").    The Debtor entered the Second SPA between itself, TI, and the Sellers, for sale of the Sellers' remaining 51% interest in the Debtor's stock.

20.    According to the Stock Purchase Agreement, the Sellers 51% interest in the Debtor's stock was comprised as follows: the Wheelers held 38,250 shares, and the McCues held 12,750 shares.  The value given to the shares, as determined by Prairie, was $164.71 per share, and the total purchase price for all of the Sellers' remaining shares was to be $8,400,000.   Of this amount, the Wheelers were to receive $6,300,000, and the McCues were to receive $2,100,000.  Agreement, paras 1, 2.

21.    In order to fund the 2017 Stock Purchase by the Debtor, the Debtor was required to and in fact did apply to First American Bank for a loan, the proceeds of which would be used to pay to the Sellers the purchase price for the stock under the terms of the Agreement.  Specifically, the Debtor borrowed the sum of $7,500,000 from First American Bank to fund this transaction.

/ / /

22.    Plaintiff is informed and believes and thereon alleges that, while the Debtor was required to obtain the loan to purchase the shares, the shares of stock purchased from the Sellers would then be in the name of the Trust, rather than in the name of the Debtor.

23.    Plaintiff is informed and believes, and thereon alleges, that the beneficiaries of the Trust were other employees of the Debtor as of the date of the Stock Purchase Agreement.

24.    The Stock Purchase Agreement also provided that the Debtor would lend to the Trust the sum of $6,448,978.00, from which the Trust would pay the obligations to the Sellers under the terms of the Stock Purchase Agreement. Agreement, para. 4.(c).  Plaintiff is informed and believes and thereon alleges that a separate agreement was prepared and signed which documented this loan.

25.    Plaintiff is informed and believes and thereon alleges that the Stock Purchase sale closed on or about June 30, 2017, at which time the following payments were made from the Trust, from the proceeds of the First American loan directly to the Sellers, as follows: the sum of $4,836,733.50 to the Wheelers, and the sum of $1,612,244.50 to the McCues.  The balance of the purchase price was to be paid to the Sellers through two notes: one payable to Wheeler in the amount of $1,677,384.48 and one payable to McCue $558,886.51.

26.    All the loans described above were based upon, and in fact relied exclusively upon, the valuation of the Debtor's stock, and the fairness opinion provided by Prairie.

C.    **Involvement of Defendants Morgan Lewis.**

27.    Plaintiff is informed and believes and thereon alleges that, at all times pertinent hereto, Defendants Morgan Lewis represented the Debtor.

28.    As a result of the attorney-client relationship created between the Defendants Morgan Lewis and the Debtor, Defendants Morgan Lewis had a duty to represent the Debtor with the reasonable care, skill, and diligence possessed and

exercised by the ordinary attorney in similar circumstances.

29.    On June 30, 2017 Defendants Morgan Lewis, over the signature of attorney Brian Hector, sent to First American Bank a letter in which it affirmed that it represented the Debtor.  A true copy of this letter is attached hereto as Exhibit "1."

30.    Plaintiff is also informed and believes and thereon alleges that, at all times pertinent to the allegations contained in this complaint, Defendants Morgan Lewis also represented the Sellers.

31.    In addition, the Plaintiff is informed and believes and thereon alleges that between May 2013 and February 2015 the Debtor paid attorney's fees of at least $239,839.41 to Defendants Morgan Lewis (this included the First APA in 2014); between January 2017 and June 2017 the Debtor paid attorney's fees of at least $202,848.92 to Defendants Morgan Lewis; and Defendants Morgan Lewis were paid an additional $75,000 directly from the escrow for the closing of the Second APA in 2017.

32.    Plaintiff is informed and believes and thereon alleges that Defendants Morgan Lewis never requested that either or both the Debtor or the Sellers sign an informed written consent in which they acknowledged and agreed that Defendants Morgan Lewis could represent all of them in connection with either the First APA in 2014 or the Second APA in 2017, despite their diametrically-opposed positions in the transaction and the actual conflicts, and that such informed written consent was never given.

33.    Plaintiff is further informed and believes and thereon alleges that Defendants Morgan Lewis' representation of the Sellers, and the existence of an actual conflict, is also demonstrated by the allegations contained in the complaint filed by the Sellers against Defendants Morgan Lewis in state court in Cook County, Illinois, in November 2020.  A true and correct copy of this complaint (without exhibits) is attached hereto as Exhibit "2."

/ / /

#4942591v1                                          - 8 -

**D.**      <u>**Discovery of Overvaluation of the Debtor's Stock.**</u>

34.      Plaintiff is informed and believes and thereon alleges that commencing in March 2019, the Debtor gave notice to the Sellers that it appeared that the purchase price set by the valuation commissioned for the Stock Purchase had over-valued the Debtor's stock by a significant amount.

35.      The Plaintiff is informed and believes and thereon alleges that the Sellers, Defendants Morgan Lewis, and Prairie knew, or should have known before the 2017 Second APA sale closed, that the stock price was too high, meaning the acquisition loan from First American Bank was too high and the Debtor would be unable to sustain payments on that loan and/or remain within the stated debt ratio. On September 30, 2019 counsel for the Debtor sent a letter to counsel for the Sellers detailing, among other things, the knowledge the Sellers had about the impending loss of the Debtor's key client before the 2017 SPA, and numerous claims that Sellers breached warranties provided and numerated in section 6.5(a) and (b) and 6.6 of the Stock Purchase Agreement. This letter was also sent to Defendants Morgan Lewis. A copy of this letter is attached hereto as Exhibit "3."

36.      Also on September 30, 2019, Paredes, the successor trustee of the ESOP Trust, sent a letter to the Sellers and their counsel, in which he alleges breaches by the Sellers of certain provisions of the 2017 Stock Purchase Agreement. Among other things, he stated that certain information was not appropriately and/or sufficiently disclosed by the Sellers to the predecessor trustee of the ESOP, and that information was known or knowable to the Sellers at the time of the sale. His letter then goes on to state that "such information concerned a material adverse change in the financial condition and prospects of the [Debtor] . . ." which "resulted in the ESOP paying more than fair market value for the stock. This loss to the ESOP has been calculated by Mr. Paredes to be between $4,236,000 and $4,447,000." This letter was also sent to Morgan Lewis. A copy of this letter is attached hereto as Exhibit "4."

37.    The ESOP Trust governing the operation of the Plan provides in Section 2-3 that the ESOP Trustee may purchase stock in the Debtor "only at prices which do not exceed the fair market value of the shares purchased, as determined by the Trustee based upon a valuation by an independent appraiser."

38.    Plaintiff is informed and believes and thereon alleges that the Sellers, Defendants  Morgan Lewis, and Prairie knew, or should have known before the Second SPA closed, that the stock price was too high, meaning the amount of the acquisition loan from First American Bank was greater than it should have been and the Debtor would be unable to sustain payments on that loan and/or remain within the stated debt ratio.

39.    Plaintiff is informed and believes and thereon alleges that the Debtor's borrowing obligations to both First American Bank and the ESOP were determined in full and solely by the valuation placed upon the stock by Prairie, and that Defendants Morgan Lewis were well aware of this fact.

40.    Plaintiff is further informed and believes and thereon alleges that the sale price for the purchase of the Sellers' stock was too high and this directly resulted in an unrealistic imposition on the Debtor's cash flow, ultimately resulting in its filing for Chapter 11 protection on August 2, 2019. At the time of the bankruptcy filing by the Debtor, and according to the schedules and statements filed under penalty of perjury, the Debtor had assets worth only $1,147,628.70, and total liabilities of $10,047,975.41.  Of the total liabilities, the sum of $6,965,927.26 was owed by the Debtor in connection with the Second SPA.  (ECF #50 filed September 6, 2019)

41.    Plaintiff is further informed and believes and thereon alleges that, prior to the closing of the Second SPA, there were indicia that the projections of future business made by the Sellers were grossly overstated resulting in the excess valuation of the stock and other problems which made the sale extremely imprudent from the position of the Debtor and the ESOP Trustee.   These indicia and problems were known to the Sellers and either were known by, or should have been known by,

Defendants Morgan Lewis, and Prairie.

42.    Plaintiff is further informed and believes, and thereon alleges that during the time period leading up to the close of the Second APA (between March and June 2017), Morgan knew or should have known that the Sellers had a direct and significant conflict of interest in connection with the Second SPA, since they were acting as both the sellers of the 51% stock interest in the Debtor, and as the agents for the Debtor, being the ones in control of the Debtor's stock and its board of directors. Specifically, Defendants Morgan Lewis knew or should have known that the Sellers' goal then was to obtain the highest possible per-share stock price, and that, for this reason (among others) the information Sellers provided in connection with the valuation and fairness opinion should have been greatly scrutinized.

43.    Plaintiff is further informed and believes and thereon alleges that Defendants Morgan Lewis knew or should have known, that (a) the ESOP Trust had no assets of its own from which to pay down the First American Bank loan; and (b) that it would be difficult for the Debtor to repay the loan to First American Bank, based upon its diminished customer base.

**E.    The Conflict.**

44.    The complaint filed by the Sellers against Defendants Morgan Lewis (Exhibit "2") includes but is not limited to the following allegations (paragraph references are to those paragraphs in the Sellers' complaint):

> 12.    Plaintiffs desired to sell their interest in the Company. Defendants recommended to Plaintiffs that they should sell their shares to the remaining employees of the Company through the Company's existing Employee Stock Ownership Plan ("ESOP"), whereby the trust for the ESOP would acquire the 51,000 shares of stock owned by Plaintiffs in exchange for $164.71 per share. See Exhibit 1, Stock Purchase Agreement, at p. 1.
>
> 13.    Defendants provided legal services to Plaintiffs, including due diligence, recommending appraisers, assessing values and sale price, negotiating the sale, advising on closing documents, and drafting a Stock Purchase Agreement.

14.     The Defendants also provided legal advice to Plaintiffs relating to the financing of the purchase by the Company. The Defendants assisted Plaintiffs in the review and drafting of financial documents, including the guarantees that Plaintiffs executed to finance the sale of the Company.

15.     As part of the closing documents, a Stock Purchase Agreement was drafted by Defendant Brian D. Hector.

16.     Defendant Brian D. Hector assisted Plaintiffs in the negotiation and drafting of the Stock Purchase Agreement. Ex. 1.

. . . .

19.     Defendant Brian D. Hector recommended to the Plaintiffs that they agree to and sign the Stock Purchase Agreement.

20.     However, Defendants did not advise Plaintiffs that Defendant Brian D. Hector had a conflict in that he was providing legal advice and services to both Plaintiffs and the Company.

. . . .

24.     Eventually, the Company defaulted on the Note and Loan Agreement it had with First American Bank by failing to maintain proper debt service coverage.

25.     The lending bank sent notice of default to the guarantors, the Plaintiffs, and the Company on May 15, 2019, notifying  them that the Company  was in default. The Company  failed to cure the breaches.

26.     On July 8, 2019, the lending bank filed a lawsuit in the United States District Court for the Northern District of Illinois, Eastern Division, captioned *First American Bank v. IntegratedMarketing.com d/b/a Roni Hicks & Associates, Jane C. Wheeler, and Diane Lori Gaynor-McCue*, case no. 1:19-cv-04594, . . .

. . . .

35.     Defendant Brian D. Hector performed legal work for Plaintiffs  in connection  with the sale of their company.

36.     Defendant Brian D. Hector subsequently performed legal work for Plaintiffs, as described in Paragraph 13.

37.     An attorney-client relationship was created between Plaintiffs and Defendant Brian D. Hector.

38.     Defendant Brian D. Hector owed a duty to Plaintiffs to use the skill, care, and diligence of a reasonably careful attorney in providing legal services to Plaintiffs.

39.     Defendant Brian D. Hector failed to act as a reasonably careful attorney for Plaintiffs in one or more of the following ways:

   a.     Drafting into the Stock Purchase Agreement an indemnity provision adverse to the Plaintiffs' interests;

   b.     Advising Plaintiffs to sign the Stock Purchase Agreement when it contained the indemnity provision;

   c.     Representing both Plaintiffs and the Company in the negotiation and drafting of the Stock Purchase Agreement, which contained the adverse indemnity provision; and

   d.     Failing to inform Plaintiffs that they should obtain separate counsel to review and advise them on the Stock Purchase Agreement.

40.     Defendant Brian D. Hector's failure to act as a reasonably careful attorney proximately caused Plaintiffs to incur damages, including attorneys' fees incurred defending indemnity claims and any and all monies Plaintiffs have been forced to pay or will pay under the indemnity clause.

. . . .

45.     Defendant Morgan Lewis owed a duty to Plaintiffs to use the skill, care, and diligence of a reasonably careful attorney in providing legal services to Plaintiffs.

46.     Defendant Morgan Lewis failed to act as a reasonably careful attorney for Plaintiffs in one or more of the following ways:

   a.     Drafting into the Stock Purchase Agreement an indemnity provision adverse to the Plaintiffs' interests;

   b.     Advising Plaintiffs to sign the Stock Purchase Agreement that contained the indemnity provision;

c.      Representing both Plaintiffs and the Company in the negotiation and drafting of the Stock Purchase Agreement, which contained the adverse indemnity provision; and

d.      Failing to inform Plaintiffs that they should obtain separate counsel to review and advise them on the Stock Purchase Agreement.

## FIRST CLAIM FOR RELIEF

**(Against All Defendants - For Professional Negligence – Breach of Duty of Care)**

45.    Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 44, inclusive, as though fully set forth herein.

46.    As set forth above, Plaintiff is informed and believes and thereon alleges that Defendants Morgan Lewis were retained by the Debtor and specifically acted as counsel to Debtor during the Second APA between the Debtor, the ESOP, and the Sellers. Defendants Morgan Lewis acted as Debtor's counsel by advising it and drafting and approving the necessary agreements and documents that made up the Second APA, including, without limitation, the documents under which the Debtor was to borrow funds from First American Bank with which to fund the Second APA.

47.    As its attorneys, Defendants Morgan Lewis owed a duty to Plaintiff to exercise reasonable care and to have the knowledge and skills necessary to handle the matters for which they were engaged.  This knowledge included, but is not limited to, knowledge sufficient to know whether or not the Debtor could afford the debt service on the loan which it had to enter into in order to fund the Second APA.

48.    However, in advising the Debtor, Defendants Morgan Lewis failed to employ the degree of reasonable care that a reasonably careful attorney would have employed in like circumstances.

49.    Defendants Morgan Lewis's conduct as described herein constituted a breach of their duty to exercise reasonable care, skill, and diligence on Debtor's behalf, and fell below the standard of care.

/ / /

50.    As a proximate result of Defendants Morgan Lewis's professional negligence, the Debtor incurred actual damages in an amount which is currently unknown, subject to proof at trial.

## SECOND CLAIM FOR RELIEF

### (Against All Defendants - For Professional Negligence –
### Breach of Fiduciary Duty and of Loyalty)

51.    Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 50, inclusive, as though fully set forth herein.

52.    As set forth above, Plaintiff is informed and believes and thereon alleges that Defendants Morgan Lewis breached its fiduciary duty and duty of loyalty to Debtor by taking the acts described herein, including but not limited to: (1) failing to fully disclose all material facts to the Debtor; (2) continuing to represent both the Debtor and the Sellers after an actual conflict of interest arose in the representation; (3) failing to disclose the conflict of interest to the Debtor; (4) failing to withdraw from representing both the Debtor and the Sellers in view of the actual conflict; and (5) continuing to advise the Sellers to seek the highest possible price for their stock, while failing to advise the Debtor that the effect of such a high value would have on the Debtor's ability to service the loan that the Debtor was required to see in order to pay the sales price to the Sellers.

53.    As Debtor's attorney and acting in a fiduciary capacity, Defendants Morgan Lewis had an obligation to be loyal to their client, the Debtor, and to disclose to the Debtor their knowledge of the actual conflict. Further, as Debtor's attorneys and acting in a fiduciary capacity, Defendants Morgan Lewis had an obligation to disclose any actual or potential conflict of interest arising from its representation, and to terminate their representation of the Debtor based on the conflict of interest that Defendants' malpractice created.

54.    However, Defendants Morgan Lewis never informed Plaintiff of their knowledge of the existence of the conflict, and that Defendants Morgan Lewis had an

obligation to withdraw from representing both the Debtor and the Sellers based upon that incurable conflict.

55. Defendants Morgan Lewis's conduct as described herein constituted a breach of their fiduciary duty and their duty of loyalty to the Debtor, and fell below the standard of care.

56. As a proximate result of Defendants Morgan Lewis's professional negligence, the Debtor incurred actual damages in an amount which is currently unknown, subject to proof at trial.

### THIRD CLAIM FOR RELIEF

**(Against All Defendants - For Professional Negligence –**

**Practicing Law in California While Unlicensed)**

57. Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 56, inclusive, as though fully set forth herein.

58. As set forth above, Plaintiff is informed and believes and thereon alleges that the actions taken by Defendants Brian Hector and Morgan Lewis, as set forth herein, were taken at a time when Defendant Brian Hector was not licensed to practice law in the state of California.

59. However, Plaintiff is informed and believes and thereon alleges that Defendant Brian Hector represented and gave legal advice to the Debtor, a California corporation with its sole place of business located in the city of San Diego, in the state of California, despite not being admitted to practice law in the state of California.

60. As a proximate result of Defendants Morgan Lewis's professional negligence, the Debtor incurred actual damages in an amount which is currently unknown, subject to proof at trial.

/ / /

/ / /

/ / /

/ / /

WHEREFORE, Plaintiff prays that the Court enter Judgment against Defendants Morgan Lewis and Brian Hector, and in favor of the Plaintiff, as follows:

1. <u>On the First Claim for Relief:</u>

   a. For damages based on Defendants' professional negligence in an amount subject to proof at the time of trial.

   b. For pre-judgment interest at the legal rate.

2. <u>On the Second Claim for Relief:</u>

   a. For damages based on Defendants' professional negligence in an amount subject to proof at the time of trial.

   b. For pre-judgment interest at the legal rate.

3. <u>On the Third Claim for Relief:</u>

   a. For damages based on Defendants' professional negligence in an amount subject to proof at the time of trial.

   b. For pre-judgment interest at the legal rate.

4. <u>On all claims for relief:</u>

   a. For refund to the Plaintiff of all attorneys' fees paid by the Debtor to Defendants Morgan Lewis;

   b. For attorney's fees and costs to the extent awardable; and

   c. For such other and further relief as deemed necessary and proper by this Court.

Dated: November 29, 2021

SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation


By:    /s/ Gary B. Rudolph
       Gary B. Rudolph
       Kathleen A. Cashman-Kramer
       Attorneys for Plaintiff, Ronald E.
       Stadtmueller, Chapter 7 Trustee

**EXHIBIT TABLE**

| Exhibit No. | Description | Page(s) |
|:---:|:---|:---:|
| 1 | Letter dated June 30, 2017 from Brian D. Hector to First American Bank | 19-23 |
| 2 | Complaint filed November 4, 2020 against Morgan Lewis & Bockius LLP and Brian D. Hector | 24-32 |
| 3 | Letter dated September 30, 2019 from William Fennell | 33-42 |
| 4 | Letter dated September 30, 2019 from Miguel Paredes | 43-46 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

#4942591v1

# EXHIBIT 1

Exhibit 1 - Page 19

# Morgan Lewis

**Brian D. Hector**
Partner
+1.312.324.1160
brian.hector@morganlewis.com

June 30, 2017

First American Bank
1650 Louis Avenue
Elk Grove Village, Illinois  60007

Re:    <u>Loan and Security Agreement dated as of June 30, 2017, by and between First
        American Bank and IntegratedMarketing.Com (dba Roni Hicks & Associates)</u>

Ladies and Gentlemen:

We have acted as counsel for IntegratedMarketing.com (dba Roni Hicks & Associates), a
California corporation (the "<u>Company</u>"), in connection with the Loan and Security
Agreement, dated as of June 30, 2017 (the "<u>Loan Agreement</u>"), by and between the
Company and First American Bank (the "<u>Lender</u>").  Terms defined in the Loan Agreement
are used as therein defined, unless otherwise defined herein.  This opinion letter is being
delivered to you pursuant to Section 6.4 of the Loan Agreement.

In connection with this opinion letter, we have examined originals, or copies certified or
otherwise identified to our satisfaction, of the Articles of Incorporation and Bylaws of the
Company and such other documents and records, and other instruments as we have
deemed appropriate for purposes of the opinions set forth herein, including the following
documents, each dated June 30, 2017, unless otherwise specified (the documents referred
to in <u>clauses (a)</u> through <u>(d)</u> below are referred to herein as the "<u>Credit Documents</u>"):

(a)    the Loan Agreement;

(b)    the Revolving Note, in the original principal amount of $350,000
executed by the Company in favor of the Lender;

(c)    the Term Note, in the original principal amount of $7,500,000
executed by the Company in favor of the Lender; and

(d)    the Collateral Assignment of ESOP Loan Documents, by and

**Morgan, Lewis & Bockius LLP**

77 West Wacker Drive
Chicago, IL  60601-5094
United States                           ☎ +1.312.324.1000
                                        🖷 +1.312.324.1001

DB1/ 90460810.3

Confidential

FAB-RONI00000000422

**Exhibit 1 - Page 20**

First American Bank
June 30, 2017
Page 2

between the Company and the Lender.

We have assumed the genuineness of all signatures, the legal capacity of natural persons, the authenticity of the documents submitted to us as originals, the conformity to the original documents of all documents submitted to us as certified, facsimile or photostatic copies, and the authenticity of the originals of all documents submitted to us as copies. We have also assumed that the Credit Documents constitute valid and binding obligations of each party thereto other than the Company.

As to any facts that are material to the opinions hereinafter expressed that we did not independently establish or verify, we have relied without investigation upon the representations of the Company contained in the Credit Documents and upon certificates of officers of the Company.

In rendering the opinions set forth herein, whenever a statement or opinion set forth therein is qualified by "to our knowledge," "known to us" or by words of similar import, it is intended to indicate that, during the course of our representation of the Company in the subject transaction, no information has come to the attention of those lawyers in our firm who have rendered legal services in connection with such transaction that gives us actual knowledge of the inaccuracy of such statement or opinion. We have not undertaken any independent investigation to determine the accuracy of facts material to any such statement or opinion, and no inference as to such statement or opinion should be drawn from the fact of our representation of the Company.

Based upon and subject to the foregoing, and to the limitations and qualifications described below, we are of the opinion that:

1.    The Company is a corporation validly existing and in good standing under the laws of the State of California with the corporate power and authority to own its properties and to carry on its business as, to our knowledge, it is now conducted.

2.    The Company has the corporate power and authority to enter into and perform the Credit Documents to which it is a party, has taken all necessary corporate action to authorize the execution, delivery and performance of such Credit Documents and has duly executed and delivered such Credit Documents.

3.    Each Credit Document is the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

4.    The execution and delivery by the Company of the Credit Documents do not, and the performance by the Company of its obligations thereunder will not, result in a violation of the Articles of Incorporation or Bylaws of the Company.

DB1/ 90460810.3

**Confidential**

First American Bank
June 30, 2017
Page 3

        The opinions expressed above are subject to the following limitations, exceptions, qualifications and assumptions:

        A.     The opinions expressed herein are subject to bankruptcy, insolvency, fraudulent transfer and other similar laws affecting the rights and remedies of creditors generally and general principles of equity, including concepts of materiality, reasonableness, good faith and fair dealing.  In addition, the enforceability of the Transaction Documents is subject to the effect of California Civil Code 1670.5, which provides that a court may refuse to enforce, or may limit the application of a contract or any clauses thereof, which the court finds as a matter of law to be been unconscionable at the time it was made.

        B.     Provisions of the Credit Documents relating to indemnification or exculpation may be limited by public policy or by law.

        C.     The opinions expressed in this opinion letter are limited to the laws of the State of California and the State of Illinois and the Federal laws of the United States of America, and we express no opinion with respect to the laws of any other state or jurisdiction.

        D.     For purposes of our opinion in <u>paragraph 1</u> hereof as to the valid existence and good standing of the Company, we have relied solely upon good standing or similar certificates issued by the appropriate authorities in the subject jurisdictions.

        E.     Certain waivers by the Company in the Credit Documents may relate to matters that cannot, as a matter of law, be effectively waived.

        F.     The enforceability of the Credit Documents, may be limited by the unenforceability under certain circumstances of provisions imposing penalties, forfeitures, late payment charges or an increase in interest rate upon delinquency in payment or an occurrence of default.

        G.     We note that Section 1717 of the California Civil Code provides that where a contract permits one party to the contract to recover attorneys' fees, the prevailing party in any action to enforce any provision of the contract shall be entitled to recover its reasonable attorneys' fees.

        H.     We express no opinion as to:

        (i)     The enforceability of any provision of the Credit Documents insofar as it provides that any Person purchasing a participation from the Lender or other Person may exercise set-off or similar rights with respect to such participation or that the Lender or other Person may exercise set-off or similar rights other than in accordance with applicable law;

DB1/ 90460810.3

Confidential

First American Bank
June 30, 2017
Page **4**

> (ii)    The enforceability of any provision of the Credit Documents permitting modification thereof only by means of an agreement in writing signed by the parties thereto;

> (iii)    The enforceability of any provision of the Credit Documents purporting to waive the right to trial by jury; or

> (iv)    The enforceability of any provision of the Credit Documents purporting to grant the right to confess judgment against the Company.

This opinion letter is effective only as of the date hereof.  We do not assume responsibility for updating this opinion letter as of any date subsequent to its date, and we assume no responsibility for advising you of any changes with respect to any matters described in this opinion letter that may occur subsequent to the date of this opinion letter or from the discovery, subsequent to the date of this opinion letter, of information not previously known to us pertaining to the events occurring prior to such date.

This opinion letter is furnished by us solely for the benefit of the Lender and its successors and permitted assigns and participants pursuant to the Loan Agreement, and this opinion letter may not be relied upon by such parties for any other purpose or by any other person or entity for any purpose whatsoever. This opinion letter is not to be quoted in whole or in part or otherwise referred to or used or furnished to any other person, except as may be required by any governmental authority or pursuant to legal process, without our express written consent.

Very truly yours,

Brian D. Hector

DB1/ 90460810.3

**Confidential**

# EXHIBIT 2

Exhibit 2 - Page 24

FILED
11/4/2020 4:07 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L011849

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, COMMERCIAL DIVISION

DIANE L. GAYNOR-McCUE,                    )
STEVEN F. McCUE, STEPHEN W. WHEELER       )
and JANE C. WHEELER,                      )
                                          )
              Plaintiffs,                 )
                                          )    Case No.    **2020L011849**
v.                                        )
                                          )    JURY DEMANDED
MORGAN, LEWIS & BOCKIUS LLP and           )
BRIAN D. HECTOR, individually,            )
                                          )
              Defendants.                 )

FILED DATE: 11/4/2020 4:07 PM  2020L011849

### COMPLAINT

NOW COMES Plaintiffs, DIANE L. GAYNOR-McCUE, STEVEN F. McCUE, STEPHEN

W. WHEELER and JANE C. WHEELER (collectively, "Plaintiffs"), by and through counsel,

KONICEK & DILLON, P.C., and for their Complaint at Law against Defendants MORGAN,

LEWIS & BOCKIUS LLP and BRIAN D. HECTOR, Individually, state as follows:

### PARTIES

1.    Plaintiff Diane L. Gaynor-McCue is an individual residing in Lake Havasu City,

Arizona.

2.    Plaintiff Steven F. McCue is an individual residing in Lake Havasu City, Arizona.

3.    Plaintiff Stephen W. Wheeler is an individual residing in Encinitas, California.

4.    Plaintiff Jane C. Wheeler is an individual residing in Encinitas, California.

5.    Defendant Brian D. Hector is admitted to practice law in the State of Illinois, and

at the times and places relevant herein, was an attorney at Defendant Morgan, Lewis & Bockius

**Exhibit 2 - Page 25**

FILED DATE: 11/4/2020 4:07 PM    2020L011849

LLP and acted as a duly authorized agent and representative of Defendant Morgan, Lewis & Bockius LLP.

6.      Defendant Morgan, Lewis & Bockius LLP ("Morgan Lewis") is a law firm with an office in Chicago, Cook County, Illinois.

7.      At all relevant times, Defendant Morgan Lewis was acting through its duly authorized agent and employee, attorney Brian D. Hector.

8.      This Court has jurisdiction over Defendants pursuant to 735 ILCS 5/2-209(b).

9.      Venue is proper in this Court pursuant to 735 ILCS 5/2-101.

<u>FACTS COMMON TO ALL COUNTS</u>

10.      Plaintiffs were the owners of IntegratedMarketing.com, a California corporation d/b/a Roni Hicks & Associates ("the Company").

11.      In June 2017, Plaintiffs owned 51,000 shares of issued and outstanding shares of common stock in the Company. Plaintiffs Jane C. Wheeler and Stephen W. Wheeler owned 38,250 shares of stock in the Company and Plaintiffs Diane L. Gaynor-McCue and Steven F. McCue owned 12,750 shares of stock in the Company.

12.      Plaintiffs desired to sell their interest in the Company. Defendants recommended to Plaintiffs that they should sell their shares to the remaining employees of the Company through the Company's existing Employee Stock Ownership Plan ("ESOP"), whereby the trust for the ESOP would acquire the 51,000 shares of stock owned by Plaintiffs in exchange for $164.71 per share. See **Exhibit 1**, Stock Purchase Agreement, at p. 1.

**Exhibit 2 - Page 26**

FILED DATE: 11/4/2020 4:07 PM    2020L011849

13.    Defendants provided legal services to Plaintiffs, including due diligence, recommending appraisers, assessing values and sale price, negotiating the sale, advising on closing documents, and drafting a Stock Purchase Agreement.

14.    The Defendants also provided legal advice to Plaintiffs relating to the financing of the purchase by the Company.  The Defendants assisted Plaintiffs in the review and drafting of financial documents, including the guarantees that Plaintiffs executed to finance the sale of the Company.

15.    As part of the closing documents, a Stock Purchase Agreement was drafted by Defendant Brian D. Hector.

16.    Defendant Brian D. Hector assisted Plaintiffs in the negotiation and drafting of the Stock Purchase Agreement. **Ex. 1**.

17.    The Stock Purchase Agreement drafted by Defendant Brian D. Hector contained a clause, whereby Plaintiffs were required to indemnify the Company and the ESOP Trustee for any loss, cost, expense, or other damage, including attorney's fees, suffered by the Company or the Trustee resulting from, arising out of, or incurred with respect to defined "Indemnified Losses." **Ex. 1**, at p. 10.

18.    The clause was drafted so broadly that it left the Plaintiffs vulnerable to any remote and tenuous claims by the Company and the ESOP Trustee.

19.    Defendant Brian D. Hector recommended to the Plaintiffs that they agree to and sign the Stock Purchase Agreement.

20.    However, Defendants did not advise Plaintiffs that Defendant Brian D. Hector had a conflict in that he was providing legal advice and services to both Plaintiffs and the Company.

Exhibit 2 - Page 27

FILED DATE: 11/4/2020 4:07 PM    2020L011849

21.     Defendants did not explain the consequences of the indemnity clause and that Plaintiffs were exposed to long term, open ended liability.

22.     The indemnity clause was so adverse to Plaintiffs that if properly explained to them, it would have been rejected by Plaintiffs.

23.     Indeed, the only parties to the transaction that could possibly benefit from the Indemnity Clause were the Company and the Trustee.

24.     Eventually, the Company defaulted on the Note and Loan Agreement it had with First American Bank by failing to maintain proper debt service coverage.

25.     The lending bank sent notice of default to the guarantors, the Plaintiffs and the Company on May 15, 2019, notifying them that the Company was in default. The Company failed to cure the breaches.

26.     On July 8, 2019, the lending bank filed a lawsuit in the United States District Court for the Northern District of Illinois, Eastern Division, captioned *First American Bank v. IntegratedMarketing.com d/b/a Roni Hicks & Associates, Jane C. Wheeler, and Diane Lori Gaynor-McCue*, case no. 1:19-cv-04594, with Counts entitled "Breach of the Guaranty Agreements" against Plaintiffs.

27.     First American Bank sought $1,500,000.00 from Plaintiff Wheeler and $500,000 from Plaintiff Gaynor-McCue, pursuant to a Guaranty Agreement entered into by Plaintiffs at the time of the Stock Purchase Agreement.

28.     On August 14, 2019, Plaintiffs entered into a settlement agreement with First American Bank, whereby Plaintiff Wheeler paid $1,500,000.00 and Plaintiff Gaynor-McCue paid $500,000.00.

**Exhibit 2 - Page 28**

FILED DATE: 11/4/2020 4:07 PM    2020L011849

29.    Consequently, they were dismissed with prejudice from the federal case on October 3, 2019.

30.    However, on September 30, 2019, both the Successor Trustee for the ESOP and the Company made claims against the Plaintiffs for indemnity pursuant to the indemnity clause in the Stock Purchase Agreement. (**Exhibit 2 and 3**).

31.    Plaintiffs attempted to negotiate a settlement with the Successor Trustee.

32.    Plaintiffs believed they reached an agreement to settle, however, that matter is now in litigation, in a Chapter 7 bankruptcy, pending in the United States Bankruptcy Court, Southern District of California, captioned *In re IntegratedMarketing.com d/b/a Roni Hicks & Associates*, Case No. 20-04688-CL7, where Plaintiffs are seeking to enforce a settlement agreement resolving the Successor Trustee's claims under the indemnity provision.

33.    The Company's indemnification claim against Plaintiffs is presently unresolved and outstanding.

<u>COUNT I – Legal Malpractice vs. Brian D. Hector</u>

34.    Plaintiffs incorporate and re-allege paragraphs 1 through 33 above as though set forth more fully herein.

35.    Defendant Brian D. Hector performed legal work for Plaintiffs in connection with the sale of their company.

36.    Defendant Brian D. Hector subsequently performed legal work for Plaintiffs, as described in Paragraph 13.

37.    An attorney-client relationship was created between Plaintiffs and Defendant Brian D. Hector.

**Exhibit 2 - Page 29**

FILED DATE: 11/4/2020 4:07 PM    2020L011849

38.    Defendant Brian D. Hector owed a duty to Plaintiffs to use the skill, care, and diligence of a reasonably careful attorney in providing legal services to Plaintiffs.

39.    Defendant Brian D. Hector failed to act as a reasonably careful attorney for Plaintiffs in one or more of the following ways:

    a.    Drafting into the Stock Purchase Agreement an indemnity provision adverse to the Plaintiffs' interests;

    b.    Advising Plaintiffs to sign the Stock Purchase Agreement when it contained the indemnity provision;

    c.    Representing both Plaintiffs and the Company in the negotiation and drafting of the Stock Purchase Agreement, which contained the adverse indemnity provision; and

    d.    Failing to inform Plaintiffs that they should obtain separate counsel to review and advise them on the Stock Purchase Agreement.

40.    Defendant Brian D. Hector's failure to act as a reasonably careful attorney proximately caused Plaintiffs to incur damages, including attorneys' fees incurred defending indemnity claims and any and all monies Plaintiffs have been forced to pay or will pay under the indemnity clause.

41.    But for the negligent conduct of Defendant Brian D. Hector, Plaintiffs would not have been obligated to pay any monies under an indemnity clause and would not have incurred any attorneys' fees defending indemnity claims.

WHEREFORE, for all of the foregoing reasons, Plaintiffs DIANE L. GAYNOR-McCUE, STEVEN F. McCUE, STEPHEN W. WHEELER and JANE C. WHEELER request that this Honorable Court enter a judgment in their favor and against Defendant BRIAN D. HECTOR,

FILED DATE: 11/4/2020 4:07 PM    2020L011849

individually, in a compensatory amount to exceed $50,000.00, and for such other and further relief that this Court deems just and proper.

<u>COUNT II – Legal Malpractice vs. Morgan, Lewis & Bockius LLP</u>

42.     Plaintiffs incorporate and re-allege paragraphs 1 through 41 above as though set forth more fully herein.

43.     Defendant Morgan Lewis performed legal work for Plaintiffs, as described in Paragraph 13.

44.     An attorney-client relationship was created between Plaintiffs and Defendant Morgan Lewis.

45.     Defendant Morgan Lewis owed a duty to Plaintiffs to use the skill, care, and diligence of a reasonably careful attorney in providing legal services to Plaintiffs.

46.     Defendant Morgan Lewis failed to act as a reasonably careful attorney for Plaintiffs in one or more of the following ways:

  a. Drafting into the Stock Purchase Agreement an indemnity provision adverse to the Plaintiffs' interests;

  b. Advising Plaintiffs to sign the Stock Purchase Agreement that contained the indemnity provision;

  c. Representing both Plaintiffs and the Company in the negotiation and drafting of the Stock Purchase Agreement, which contained the adverse indemnity provision; and

  d. Failing to inform Plaintiffs that they should obtain separate counsel to review and advise them on the Stock Purchase Agreement.

47.     Defendant Morgan Lewis' failure to act as reasonably careful attorneys proximately caused Plaintiffs to incur damages, including attorneys' fees incurred defending

**Exhibit 2 - Page 31**

FILED DATE: 11/4/2020 4:07 PM    2020L011849

indemnity claims and any and all monies Plaintiffs have been forced to pay or will pay under the indemnity clause.

48.    But for the negligent conduct of Defendant Morgan Lewis, Plaintiffs would not have been obligated to pay any monies under an indemnity clause and would not have incurred any attorneys' fees defending indemnity claims.

WHEREFORE, for all of the foregoing reasons, Plaintiffs DIANE L. GAYNOR-McCUE, STEVEN F. McCUE, STEPHEN W. WHEELER and JANE C. WHEELER request that this Honorable Court enter a judgment in their favor and against Defendant MORGAN, LEWIS & BOCKIUS LLP in a compensatory amount to exceed $50,000.00, and for such other and further relief that this Court deems just and proper.

*Respectfully submitted,*

Daniel F. Konicek (6205408)
Peter L. LeGrand (6330015)
KONICEK & DILLON, P.C.
21 W. State St.
Geneva, IL 60134
630.262.9655
dan@konicekdillonlaw.com
peter@konicekdillonlaw.com

**Exhibit 2 - Page 32**

# EXHIBIT 3

Exhibit 3 - Page 33

# LAW OFFICE OF WILLIAM P. FENNELL

### A Professional Law Corporation

William P. Fennell *

_____

Of Counsel
Melissa A. Blackburn Joniaux
Charles F. Bethel

*Licensed in Colorado

600 West Broadway, Suite 930
San Diego, CA 92101
Tel: (619) 325-1560
Fax: (619) 325-1558
William.Fennell@fennelllaw.com

September 30, 2019

Howard J. Levine, Esq.
John A. Simon
**Drinker Biddle & Reath LLP**
191 North Wacker Drive, Suite 3700
Chicago, IL 60606-1698

Re:    Notification of Claims for Indemnity Under June 30, 2017 Stock Purchase Agreement as Against Jane Carey Wheeler, Stephen W. Wheeler, Diane L. Gaynor-McCue and Steven F. McCue

Gentlemen:

We are writing on behalf of our client, Integratedmarketing.com d/b/a Roni Hicks & Associates, as debtor in the matter *In re Integratedmarketing.com*, So. Dist of CA. Bk Case No. 19-04688 ("Roni Hicks" or "the Company") for the purpose of notifying of claims arising out of the March 13, 2014 and June 30, 2017 Stock Purchase Agreements (the "SPAs" collectively) entered into between Jane Carey Wheeler, Stephen W. Wheeler, Diane L. Gaynor-McCue and Steven F. McCue (the "Sellers"), the Company and First Bankers Trust Services, Inc. ("FBTS") as the Trustee of the Roni Hicks & Associates Employee Stock Ownership Trust ("Trust"). The claims include, but are not limited to, those matters at issue in the Complaint filed on July 8, 2019 by First American Bank (the "Bank") as Case No. 1:19-cv-04594 in the United States District Court Northern District of Illinois Eastern Division (the "Lawsuit") and to such additional claims as enumerated below.

This letter is notification to the Sellers pursuant to Section 16(d) of the June 30, 2017 SPA of the Company's claims (and to the extent applicable claims of the ESOP Trustee) for indemnification against the Sellers commencing of the 90 day period to seek settlement of the Company's (and the ESOP Trustee's) claims against the Sellers. If no satisfactory settlement is reached the Company intends to proceed to arbitration pursuant to section 26.

Exhibit 3 - Page 34

Howard Levine
John A. Simon
September 30, 2019
Page 2

The Claim as stated herein arises out of the transactional documents executed by Jane Wheeler ("Ms. Wheeler") as President of the Company as well as the loan guaranties executed by Ms. Wheeler and Diane Gaynor ("Ms. Gaynor"). The purpose of the transaction evidenced by the June 30, 2017 documents was to provide financing for the sale of the stock from Ms. Wheeler and Ms. Gaynor to the Trust in June of 2017 ("the 2017 SPA").

In addition to the Bank providing financing for the sale of the stock from Ms. Wheeler and Ms. Gaynor, FBTS brokered the sale and Prairie Capital Advisors, Inc. ("Prairie") conducted an appraisal of the Company's value in order to set the sale price of Sellers' shares of stock in the Company, resulting in the Company's borrowing obligations to both the Bank and the Roni Hicks & Associates Employee Stock Ownership Plan ("ESOP") and to the Sellers.

As discussed herein, it is undisputed that the sale price for the purchase of the Sellers' stock was too high and this has resulted in an unrealistic imposition on the Company's cash flow, ultimately resulting in the filing for Chapter 11 protection. Some evidence that parties do not dispute these facts is that Sellers have tendered and Bank has accepted $2,000,000 (Sellers' guarantee) to the Roni Hicks' note to Bank, since the time the Company filed for bankruptcy.

Further, it is clear that prior to the closing of the 2017 SPA, there were clear indicia that the projections of future business made by the Sellers were grossly overstated resulting in the excess valuation of the stock and other problems which made the sale extremely imprudent from the position of the Company and the ESOP Trustee. These indicia and problems were known to the Sellers and should have been known by FBTS, Prairie, and the Bank and as a result, each of these parties bears some liability to the Company. However, the purpose of this letter is to notify Sellers of the Company's Claim for indemnity in a timely manner under section 16 of the 2017 SPA as amended in June 2019.

## I.  THE ORIGIN OF THE BANK DEBT IN THE 2017 SPA TRANSACTION

Roni Hicks notes a  factual outline of the 2017 SPA is laid out in ¶¶6-21 of the Declaration of Aaron Smith, DN 9-3, as filed with the bankruptcy case on August 8, 2019. Specifically, the Company made a note in favor of the Bank for $7,500,000 (along with a loan and security agreement) and the loan was supposed to be repaid at the rate of $89,285.21 in principal, along with interest, each month. The Sellers, for their part, executed guaranties to the Bank of the Company's indebtedness – $1,500,000 in Ms. Wheeler's case and $500,000 in Ms. Gaynor's.  .

Section  ¶16 of the 2017 SPA obligates the Sellers to indemnify the Company and the ESOP "for any loss, cost, expense, or other damage ... suffered by the Company or by the Trustee [ESOP] resulting from, arising out of, or incurred with respect to: (I) the falsity or the breach of any representation, warranty, or covenant made by the Sellers in this Agreement." Paragraph 6.5(b) of the same document attested the accuracy of the financial statements associated with the SPA.

**Exhibit 3 - Page 35**

Howard Levine
John A. Simon
September 30, 2019
Page 3

In addition to the indemnities, both the 2014 SPA (Section 25) and the 2017 (Section 27) required the Sellers to pay their own costs regarding the stock sales. Nevertheless, Roni Hicks paid Brookwood Vance (the Sellers' appraiser) $38,000 and it paid $443,000 in legal fees to Morgan, Lewis, Brockius for work which benefitted the Sellers far more than the Company. These amounts are owed to the Company by the Sellers as a direct claim.

## II.  THE STOCK PRICE WAS OVERVALUED, LEADING TO RONI HICKS TAKING ON FAR TOO MUCH DEBT

Before the ESOP could purchase the Sellers' shares in 2017, a price had to be set – the resulting per share valuation was supposed to reflect the going concern value of the Company. Prairie set this value by taking a completed business year's cash income and discounting the expected future receipts to reflect the uncertainties of the market in which Roni Hick operates. Prairie's resulting "enterprise value" appraisals showed the per share price of the stock in June 2017 should be $164.00. This number yielded, in turn, the total amounts the Sellers were to be paid for their shares and consequently the size of the loan the Company had to borrow from the Bank (as indicated above, $7,500,000). In addition to the obligation to the Bank the Sellers received promissory notes, respectively Wheeler $1,677,384.48 and McCue $558,886.51 as a result of the per share value stated by Prairie. This further adversely effecting the Company's finances.

It is notable that Prairie produced such appraisals (which ran into the many dozens of pages) for December 2016, June 2017 and December 2017.  The Company was provided copies of the December 2016 and December 2017 appraisals, Prairie did not produce the full June 2017 appraisal to either the Company or the ESOP Trustee until recently following repeat demands made by the successor ESOP Trustee.

The evidence the 2017 SPA price was too high, along with the debt the Company took on, accumulated quickly after the SPA closed June 30, 2017.  Notably, in six months, (June to December 2017) Prairie's price per share valuation had dropped from $164 to $1. Additionally, there was a peculiar quality in the hypothetical cash flow discounts Prairie had used to come up with the $164 per share figure (See pages 6-8 of Delgleish Power Point Exh. A).

Sellers were provided in March 2019 notice by the Company of the over valuation.  That presentation was made by the then President Aaron Smith, Controller Janis Strockis, and Board Member J. Martin Dalgleish, supported by a power point presentation.  A copy of that power point presentation is attached hereto as "Exhibit A" as created by Mr. Dalgleish, entitled "RHA The Way Forward Thoughts" consists of 17 slides, sets forth a discussion of valuation claims of the Company.

**Exhibit 3 - Page 36**

Howard Levine
John A. Simon
September 30, 2019
Page 4

At the time of the 2014 SPA, Prairie applied a 15.5% cash flow discount; when Prairie again valued the company in December 2016, it used a 16.5% discount. Nevertheless, six months later, at a time when the Company was taking on a very large amount of debt and changing over its entire management team, Prairie lowered the future cash flow discount to 15.5%, meaning the price per share estimate came out higher than it should have (and the estimate of the future hazards to the Company came out too low). As discussed below, there was additional information about adverse events before the 2017 SPA closed which should have led Prairie to a far more conservative valuation of the stock. There existed issues adversely effecting the future of the customer contracts that Sellers should have disclosed to all parties to the June 2017 transaction.

The over-valued loan has meant Roni Hicks made excessively high monthly payments to the Bank. This meant a loss of available cash the Company could otherwise have used to operate and promote its business operations. This meant the Company suffered in a continual cash poor condition and it meant the Company lost valuable customers as it has not been able to induce them to stay, a situation which started before the bankruptcy filing and has accelerated since seeking the protection of the Bankruptcy Court.

Simply put, if the share price had been lower and more reasonable, so too would the amount of the Bank loan. Roni Hicks' monthly borrowing and operating costs would have been lower, leaving more cash available for the Company's operating capital needs.

## III. ADDITIONAL DAMAGES FROM THE 2017 SPA

Aside from the financial drag on the Company and the lost opportunities, the 2017 SPA and loan led to at least two further forms of damage. First, with respect to the per share value of the stock already owned by the ESOP and, second, regarding the Company's employee 401(k) plan.

As all the parties are aware, the Sellers transferred the first 49% of their shares in Roni Hicks to the ESOP through a Stock Purchase Agreement in 2014. Logically, if the remaining 51% of the stock had a value of $164 per share in June 2017, so too did the shares already held by the ESOP. As indicated above, the Company believes $164 per share was too high – but the shares already held by the ESOP had some value before the 2017 SPA. Because the 2017 SPA led to the taking on of extremely high debt to the Bank, the sale of the 51% of the Sellers' shares led directly to making the Company insolvent with the result the original 49% of shares became effectively valueless within six months.

As for the 401(k), the Bank is the administrator of this plan. It had been the Company's practice each year to make an employer contribution of 6% of the employee salaries to the 401(k). Nevertheless, toward the end of the 2018 calendar year, when the Company's financial distress from the 2017 SPA had become apparent, the Bank intervened with the management, as both lender and 401(k) administrator, declaring it would not permit the Company to make the 2018

**Exhibit 3 - Page 37**

Howard Levine
John A. Simon
September 30, 2019
Page 5

401(k) contribution.  As explained above with respect to poor cash flow in general, this failure to make the 401(k) contribution put Roni Hicks at risk of losing and/or maintaining valuable and talented employees.

## IV.  THE INDICATORS REGARDING OVERVALUATION IN THE 2017 SPA

Roni Hicks believes it is clear the Sellers, the Bank, FBTC and Prairie knew, or should have known before the 2017 sale closed, that the stock price was too high, meaning the acquisition loan from the Bank was too high and the Company would be unable to sustain payments on that loan and/or remain within the stated debt ratio.  The indicators in question fell into two areas:  First, the Sellers knew about the impending loss of the Company's key client before the 2017 SPA.  Second, the transaction included self-dealing by the Sellers (known to the Bank, FBTC and Prairie) and a number of peculiarities uncommon in a sale and loan deal of the type and size of the SPA.  The Company asserts that Sellers actions are breaches of warranties provided and numerated in section 6.5(a) and (b) and 6.6.  Company holds direct claims against the Sellers and seeks indemnity for claims asserted by the Bank and others against the Company.

### A.  Loss of Newland Business

Prior to 2017, 60 to 65% of Roni Hicks' sales each year came from its largest marketing customer, Newland Communities (and leader in it's industry that other customers follow).  Those sales came from the Company's longstanding working relationship with Newland's chief marketing officer, Teri Slavic-Tsuyuki.  However, in early 2017, Newland terminated Ms. Slavic-Tsuyuki's employment and the remaining Newland management began canceling contracts with Roni Hicks.  These were facts know to Sellers before June 30, 2017.

It does not matter why Newland elected to sever Ms. Slavic-Tsuyuki's employment or why it began cancelling its Roni Hicks contracts.  What matters is that several months before the 2017 SPA closed, the Sellers, who were still in control of Roni Hicks' operations, knew the existing Newland business was being withdrawn and the likelihood of the Company getting future contracts from Newland was very unlikely to occur.

Especially problematic for the Sellers on the Newland point is ¶6.11 of the 2017 SPA stated there had been no contract cancellations by any of the Company's clients.  Ms. Wheeler signed this document on Roni Hicks' behalf as its president.

The Company believes the Sellers failed to inform Prairie (as the appraiser), FBTC (as the broker) and the Bank (as lender) before the 2017 SPA closed that it was already on the way to losing upwards of sixty percent of its income base.  To the extent Prairie, FBTC or the Bank (or individual officers of the Bank) did know about the loss of Newland, it is self-apparent each of them acted wrongfully by not postponing the sale and requiring a reappraisal/new evaluation.  But

Exhibit 3 - Page 38

Howard Levine
John A. Simon
September 30, 2019
Page 6

in any event, the Company, Roni Hicks also believes if these parties did not know, that Prairie, FBTC, and the Bank would have been able to have learned the relevant information if they had performed a due and diligent inquiry.

### B.  Self-Dealing and Lax Appraisal, Brokerage, and Lending Practices

The Sellers' self-dealing took several forms, each of them known or knowable to Prairie, FBTC and the Bank at the time of accelerated payment of 2014 acquisition loan:

- The Sellers had, of course, pledged securities accounts they had at TD Ameritrade to secure the Bank's acquisition loan to Roni Hicks with respect to the 2014 SPA of the first 49% of shares.  That loan had been for $5,500,000 and the full term of the note ran from 2014 to 2019.

- Under the Sellers' direction, the Company used significant amounts of its cash flow in 2015, 2016, and the first half of 2017, to accelerate the pay off of the 2014 acquisition loan.  Notably, between December 2016 and June 2017, the Sellers caused the Company to pay out $1,500,000 to the Bank on the 2014 loan.

- The accelerated payment of the 2014 loan was, of course, known to the Bank and it would have been known to FBTC and Prairie through a diligent inquiry as it was reflected in Roni Hicks' financial reports.

- The accelerated pay down of the 2014 loan debilitated Roni Hicks by draining vital cash reserves stunting the growth and development of business operations while directly benefitting the Sellers by allowing Sellers to obtain releases of the Bank's liens against their TD Ameritrade accounts and by creating a false appearance of financial strength of Roni Hicks Operations.

To the extent Company is liable to Bank, Company asserts it is entitle to indemnity of Sellers resulting from their action of financial benefits each received above.

### C.  Ms. Wheeler Acted for Her Own Benefit at the Time She Was an Officer of the Company

Ms. Wheeler executed the 2017 stock purchase agreement on her own behalf as seller and on Roni Hicks' behalf as its CEO.  Ms. Wheeler likewise signed the June 30, 2017 loan and security agreement and the promissory note in favor of the Bank on behalf of Roni Hicks as its CEO.  Of further note, Ms. Wheeler's adult daughter (who was otherwise unconnected to the Company operations) had been appointed to sit on the Company's board of directors and she voted in favor of the 2017 SPA when it was presented to the Board.

Exhibit 3 - Page 39

Howard Levine
John A. Simon
September 30, 2019
Page 7

These actions by Ms. Wheeler were, again, known to or knowable by Prairie, FBTC and the Bank, and as result Company is entitle to indemnify from Sellers for claims of the Bank.

### D.  Laxity in appraisal, brokerage and banking

The Company submits it is self-apparent Prairie, FBTC, and the Bank did not do adequate inquiries into the Company's books and business based on all the foregoing.

The Bank did not act in accordance with generally accepted risk standards in making the 2017 acquisition loan and Sellers actions leading up to the lending event contributed over to encumbering of the Company.  It's the Company's position that Sellers engaged in a course of conduct, including breaching expressed warranties set forth in paragraphs 5, 6.3 (c) and 6.11 of the 2017 SPA which resulted in an over valuation of the stock and resulting in loan obligation to Bank, which the Company has been unable to service.

Specifically, the Bank lent $7,500,000 (and an additional $350,000 in a revolving credit line) in 2017 but only required $2,000,000 worth of guaranties from the Sellers. [The Bank was (and is) unsecured as to the remaining $5,500,000 – the collateral the Bank did obtain from the Company consists of what evanescent assets such as accounts receivable, as opposed to more typically solid business assets such as patents, copyrights, software licenses, or manufacturing equipment or real estate (Roni Hicks does not, of course, own any of these more tangible assets).

## V.  THE ERISA PROBLEM

We will discuss the liabilities the Sellers, et al. may have in more detail below.  But on the matter of the mis-valuation of the shares sold in the 2017 SPA, we simply note that even without any intentional wrongdoing, the stock undervaluation by itself may have been an ERISA violation, subjecting the whole transaction to being overturned on that basis.

## VI.  ABSENT SETTLEMENT, RONI HICKS EXPECTS TO LITIGATE ITS CLAIMS AGAINST THE SEVERAL PARTIES

We believe Roni Hicks has claims against the Sellers, counter-claims against the Bank and third party claims against, FBTC and Prairie.  If the Company is required to file claims before an arbitrator (or in one or more adversary proceedings in the San Diego Bankruptcy proceeding of the Company), those claims will be made:

Claims against Ms. Wheeler and Ms. Gaynor exist under the indemnity clauses of the 2017 SPA in an amount not less than $6,300,000 made pursuant to ¶16(b)(ii) of the 2017 SPA.

Exhibit 3 - Page 40

Howard Levine
John A. Simon
September 30, 2019
Page 8

Further claims against Ms. Wheeler will be made for breach of fiduciary duty for:
1. failing to disclose the loss of the Newland account prior to closing of the 2017 SPA;
2. the paying down the 2014 SPA too quickly in Spring 2017 (which was not in the Company's best interest as set forth above);
3. Sellers self-dealing in execution of the 2017 SPA documents; and
4. and for continued self-dealing as a member of the Board of Directors for the period early 2017 to August 2019.

Additional claims to be made in an arbitration (or to be filed as an adversary complaint) against Sellers for indemnity, will be made as claims are pursued against FBTC and Prairie and Bank under the ERISA standards for failing to do an adequate appraisal of the Company's value before the closing of the 2017 SPA and ignoring the Sellers' obvious conflicts of interest in the sale transaction.

We are aware from the Complaint of the Bank, it contends Roni Hicks holds no claims or defenses based on the supposed waiver in the March 2019 forbearance agreement. Without going into the merits of this question at present, suffices it to say Roni Hicks disagrees; and so Sellers are on notice.

## VII.  A SETTLEMENT PROPOSAL

1. Roni Hicks' loan obligation on the 2017 SPA will be lowered from the $6,865,627.26 stated in the Bank's July 8, 2019 complaint to $2,000,000 and this lowered amount will not be augmented by any of the unpaid interest, fees, or legal costs (including attorney's fees) complained of by the Bank.

2. It will be up to the Bank, Ms. Wheeler, Ms. Gaynor, FBTC and Prairie to apportion the remaining $4,965,627.26 (and the attendant interest, fees, and legal costs) among themselves.

3. In exchange for the debt reduction, Roni Hicks will release the indemnity and direct claims it holds against the Sellers and the other claims it may hold against the Bank, FBTC and Prairie.

In the event a satisfactory resolution cannot be reached, the Company intends to proceed defending itself in the Chicago District Court case, part of which will entail counter-claims against the Bank and third party claims against the Sellers, FBTC and Prairie and arbitrating claims as set forth herein.

Exhibit 3 - Page 41

Howard Levine
John A. Simon
September 30, 2019
Page 9


We believe we have laid out colorable claims and defenses with respect to the Sellers, the Bank, FBTC and Prairie.

We therefore hope this letter will receive your careful consideration and that Sellers will reconsider your resistance to the idea of settlement these disputes.

Sincerely,
LAW OFFICE OF WILLIAM P. FENNELL, APLC

/s/William P. Fennell

William P. Fennell


WPF/cfb
cc:

| | TO THE SELLERS: | TO THE TRUSTEE |
|---|---|---|
| Larry A. Goldberg, Esq.<br>**ESOP Law Group**<br>244 California Street, Suite 300<br>San Francisco, CA 94111 | Jane Carey Wheeler and Stephen W. Wheeler<br>1206 Caminito Graciela<br>Encinitas, CA 92024 | First Bankers Trust Services, Inc.<br>2321 Kochs Lane<br>Quincy, Illinois 62305-4005<br>Attention: RHA AccountOfficer |
| Prudent Fiduciary Services, LLC<br>100 N. Barranca St., Suite 870<br>West Covina, CA 91791<br>Attention: Miguel Paredes | Diane L. Gaynor-McCue and Steven F. McCue<br>2901 Amigo Drive<br>Lake Havasu City, Arizona 86404 | Schatz Brown Glassman LLP<br>1007 Farmington Avenue – Suite 4<br>West Hartford, CT 06107<br>Attention: Robert Schatz |
| First Bankers Trust Services, Inc.<br>2321 Kochs Lane<br>Quincy, Illinois 62305-4005<br>Attention: Roni Hicks & Associates<br>Account<br>Officer | Morgan, Lewis & Bockius LLP<br>77 West Wacker Drive<br>Chicago, Illinois 60601<br>Attention: Brian Hector | |

Exhibit 3 - Page 42

# EXHIBIT 4

Exhibit 4 - Page 43

# PRUDENT FIDUCIARY
## S E R V I C E S

September 30, 2019

**<u>Via Email & FedEx</u>**

Jane Carey Wheeler
Stephen W. Wheeler
Diane L. Gaynor-McCue
Steven F. McCue
c/o Howard Levine
Drinker Biddle & Reath LLP
191 N. Wacker Dr., Ste. 3700
Chicago, IL 60606

Jane Carey Wheeler
Stephen W. Wheeler
1206 Caminito Graciela
Encinitas, CA 92024

Diane L. Gaynor-McCue
Steven F. McCue
2901 Amigo Dr.
Lake Havasu City, AZ 86404

RE:   Roni Hicks & Associates Employee Stock Ownership Plan
Trustee's Written Notice to Assert Right of Indemnification

Dear Ms. Wheeler, Mr. Wheeler, Ms. Gaynor-McCue, and Mr. McCue:

I, Miguel Paredes, am the current and successor trustee (the "Trustee") of the Roni Hicks &
Associates Employee Stock Ownership Trust (the "Trust"), which forms part of the Roni Hicks
& Associates Employee Stock Ownership Plan (the "Plan" or "ESOP").

This letter serves as written notice of my assertion of an indemnification claim made as of
September 30, 2019, as the ESOP's Trustee and on behalf of the ESOP and its participants and
beneficiaries, against Jane Carey Wheeler, Stephen W. Wheeler, Diane L. Gaynor-McCue, and
Steven F. McCue (the "Sellers"), pursuant to the Stock Purchase Agreement dated June 30, 2017
by and among the Sellers, IntegratedMarketing.com d/b/a Roni Hicks & Associates (the
"Company"), and First Bankers Trust Services, Inc., the predecessor trustee of the Trust (the
"Predecessor Trustee"), as well as Amendment No. 1 to the Stock Purchase Agreement dated
June 21, 2019 executed by the Sellers, the Company, and me, in my capacity as the successor
trustee of the Trust (together, the "Stock Purchase Agreement").

After reviewing the circumstances surrounding the June 30, 2017 purchase of Company stock by
the ESOP (the "2017 ESOP Transaction"), I have determined that the following representations,

100 N. Barranca St., Suite 870          T. (626) 549-1410          mparedes@fiduciaryservices.com
West Covina, CA 91791          F. (626) 384-3342          www.fiduciaryservices.com
Exhibit 4 - Page 44

warranties, and/or covenants contained in the Stock Purchase Agreement were breached on the part of the Sellers:

- Section 6.6: "Interim Operations.  Except for agreements entered into and liabilities incurred in connection with the establishment of the Plan and the financing of the purchase and sale of the Shares contemplated by this Agreement, since December 31, 2016: (a) the business of the Company has been carried on in the usual course; (b) there has been no material adverse change in the financial condition, results of operations, assets, liabilities, business, or prospects of the Company; and (c) there has been no other material change in the financial condition, results of operations, assets, liabilities, business, or prospects of the Company, except in the ordinary course of business."

- Section 6.11: "Contracts.  All of the contracts to which the Company is a party (the "Contracts") are valid, binding, and enforceable according to their terms; there is no default or event that with notice or lapse of time, or both, would constitute a default by any party to any of the Contracts; the Company has not received any notice that any party to any of the Contracts intends to cancel or terminate any of the Contracts; and the Company is not a party to or bound by any agreement that is materially adverse to the business or financial condition of the Company."

- Section 6.21: "Pre- and post-Transaction Solvency.  The Company is and, after giving effect to the transactions contemplated by this Agreement, the Company's making of the ESOP and Seller Loans to the Trustee to enable the Trustee to purchase the Shares and the Company's receipt of loans from First American Bank for the purpose of, among others, funding the ESOP Loan, referred to herein as the "transactions contemplated by this Agreement"), will be: (a) in compliance with the requirements of Sections 500-509 of the California Corporations Code based on the most recent financial statements available to the Sellers at the time of Closing Date, (b) the Company's working capital is adequate to meet its current and projected obligations to creditors as and when they become due; and (c) the Company will not be left with an unreasonably small amount of capital with which to meet its obligations."

- Section 6.22: "Disclosure.  None of the representations or warranties made by the Sellers in this Agreement, and none of the statements made in the Disclosure Schedule or any document furnished pursuant to this Agreement, contain any untrue statement of a material fact, or omit to state any material fact necessary in order to make the statements contained herein or therein not misleading."

After examining the 2017 ESOP Transaction, which included reviewing information and documentation relating to the transaction and conducting interviews with several of the principal parties involved in the transaction, I have determined that certain information was not appropriately and/or sufficiently disclosed by the Sellers to the Predecessor Trustee relating to the status of one of the Company's key clients, Newland Communities, and the Company's financial outlook as a result of the change in this client's status.  Based on my review of the 2017 ESOP Transaction, I have determined that the information that was not disclosed appropriately and/or sufficiently was known and/or knowable at the time of the 2017 ESOP Transaction.

Exhibit 4 - Page 45

Moreover, such information concerned a material adverse change in the financial condition and prospects of the Company; involved a party to a Company contract and its intent to cancel or terminate its contract; would have indicated an issue with the Company's post-transaction solvency based on the Stock Purchase Agreement terms as executed; and involved material facts necessary to support the terms of the Stock Purchase Agreement as executed.

As Trustee, I have determined that due in significant part to the Sellers' breaches of the aforementioned representations, warranties, and/or covenants in the Stock Purchase Agreement, the 2017 ESOP Transaction was based on an overstatement of value of the Company, which resulted in the ESOP paying more than fair market value for the stock. This loss to the ESOP has been calculated by the Trustee to be between $4,236,000 and $4,447,000.

As Trustee, I acknowledge that this claim shall be resolved pursuant to the procedures outlined in the Stock Purchase Agreement in Sections 16(d) and 25, and any other relevant sections.

Please contact me if you would like to further discuss this matter.

Sincerely,

Miguel Paredes, not in his individual or corporate
capacity, but solely in his capacity as Trustee of the
Roni Hicks & Associates Employee Stock
Ownership Plan and associated Trust

Cc:    Morgan, Lewis & Bockius LLP
       77 West Wacker Drive
       Chicago, IL 60601
       Attention: Brian Hector

3

Exhibit 4 - Page 46